UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| In re: | ) Case No. 14-40206-LKG |
| | ) |
| DEBRA L. RICE, | ) Chapter 7 |
| | ) |
| Debtor. | ) |
| | ) |
| VANDERBILT MORTGAGE AND | ) |
| FINANCE, INC. | ) |
| | ) |
| Movant, | ) |
| v. | ) |
| | ) |
| DEBRA L. RICE, | ) |
| Debtor, | ) |
| | ) |
| and | ) |
| | ) |
| DANA S. FRAZIER, | ) |
| Trustee, | ) |
| | ) |
| Respondents. | ) |

## MOTION FOR RELIEF FROM AUTOMATIC STAY
## BY VANDERBILT MORTGAGE AND FINANCE, INC.

Vanderbilt Mortgage and Finance, Inc. ("Vanderbilt"), respectfully states as follows:

1.     Vanderbilt holds a claim secured by certain real property commonly known and numbered as 1151 State Route 153, Coulterville, Illinois 62237 (the "Realty") including a 2010 Clayton Blue Ridge Mobile/Manufactured Home, VIN #CLM091169TN, including all fixtures therein (collectively, the "Property").

2.     A copy of the Manufactured Home Retail Installment Contract and Disclosure Statement that evidences the indebtedness to Movant is marked as Exhibit 1.

3.     A copy of the Certificate of Title and recorded Mortgage that evidence perfection of Movant's security interest in the Property are marked as Exhibit 2.

4.    The Debtor is in default of her obligations to Movant for all payments from and after August 4, 2013.

5.    The current principal and interest amount due and owing to Vanderbilt is approximately $57,430.97.

6.    The property has a present value of approximately $61,475.20 according to the Land Appraisal Report and NADA Guide.

7.    Cause exists for granting relief from the automatic stay in that the Debtor has failed to make payments to Vanderbilt, Debtor may not have maintained current evidence of insurance on the Property, and Debtor intends to surrender the Property.

8.    Debtor does not have equity in the Property, and such Property is not necessary for an effective reorganization.

9.    Vanderbilt is entitled to immediate relief without further stay because its collateral is declining in value, the uncertainty of insurance coverage exposes the collateral to risk of loss, and Debtor intends to surrender the Property.

WHEREFORE, Vanderbilt Mortgage and Finance, Inc. prays this Court enter its Order granting relief from the automatic stay pursuant to 11 U.S.C. § 362(d) and authorizing Vanderbilt to exercise its rights under its loan documents and applicable nonbankruptcy laws immediately without any delay or stay under Rule 4001 or otherwise, and for such other relief as the Court deems just and proper.

*/S/David G. Wasinger*
David G. Wasinger, IlBar #06200269
James S. Cole, IlBar #06314940
THE WASINGER LAW GROUP, P.C.
Magna Place, Suite 875
1401 South Brentwood Boulevard
St. Louis, Missouri 63144
(314) 961-0400; (314) 961-2726 FAX
Attorney for Vanderbilt Mortgage and Finance, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served electronically upon the the U.S. Trustee, according to the Court's electronic notice procedures, and that a further copy was mailed by U.S. Mail, postage prepaid, this 21st day of March, 2014, to:

Pamela K. Hicks, Attorney for Debtor
310 East Main Street
Carbondale, Illinois 62901

Dana S. Frazier, Trustee
P.O. Box 159
Murphysboro, Illinois 62966

Debra L. Rice
5495 Peony Road
Coulterville, Illinois 62237

*/S/David G. Wasinger*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In re: | ) | Case No. 14-40206-LKG |
| | ) | |
| DEBRA L. RICE, | ) | |
| | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| VANDERBILT MORTGAGE AND | ) | |
| FINANCE, INC., | ) | |
| | ) | |
| Movant, | ) | |
| v. | ) | |
| | ) | |
| DEBRA L. RICE, | ) | |
| Debtor, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DANA S. FRAZIER, | ) | |
| Trustee, | ) | |
| | ) | |
| Respondents. | ) | |

STATEMENT OF ADDITIONAL ENTITIES WITH INTERESTS IN COLLATERAL

On information and belief, Movant states that the following persons and entities (other than Debtor, co-Debtor, and Movant) have interests in the Property that is the subject of the Motion to Lift Stay:

1.     None.

/S/David G. Wasinger

David G. Wasinger, IlBar #06200269
James S. Cole, IlBar #6314940
THE WASINGER LAW GROUP, P.C.
Magna Place, Suite 875
1401 South Brentwood Boulevard
St. Louis, Missouri 63144
(314) 961-0400; (314) 961-2726 FAX
Attorney for Vanderbilt Mortgage and Finance, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served electronically upon the U.S. Trustee, according to the Court's electronic notice procedures, and that a further copy was mailed by U.S. Mail, postage prepaid, this 21st day of March, 2014, to:

Pamela K. Hicks, Attorney for Debtor
310 East Main Street
Carbondale, Illinois 62901

Dana S. Frazier, Trustee
P.O. Box 159
Murphysboro, Illinois 62966

Debra L. Rice
5495 Peony Road
Coulterville, Illinois 62237

/S/David G. Wasinger

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In re: | ) | Case No. 14-40206-LKG |
| | ) | |
| DEBRA L. RICE, | ) | |
| | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| VANDERBILT MORTGAGE AND | ) | |
| FINANCE, INC., | ) | |
| | ) | |
| Movant, | ) | |
| v. | ) | |
| | ) | |
| DEBRA L. RICE, | ) | |
| Debtor, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DANA S. FRAZIER, | ) | |
| Trustee, | ) | |
| | ) | |
| Respondents. | ) | |

## SUMMARY OF EXHIBITS AND CERTIFICATE OF SERVICE

The following exhibit(s) pertain to the Motion for Relief From Automatic Stay filed by Vanderbilt Mortgage and Finance, Inc. on March 21, 2014.

1. Manufactured Home Retail Installment Contract and Disclosure Statement; and

2. Certificate Title on a 2010 Clayton Homes Blue Ridge Mobile/Manufactured Home and a recorded Mortgage showing lien perfection of Vanderbilt Mortgage and Finance, Inc.

*/S/David G. Wasinger*
David G. Wasinger, Ill. Bar #06200269
James S. Cole, IlBar #6314940
THE WASINGER LAW GROUP, P.C.
Magna Place, Suite 875
1401 South Brentwood Boulevard
St. Louis, Missouri 63144
(314) 961-0400; (314) 961-2726 FAX

Attorneys for Vanderbilt Mortgage and
Finance, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served electronically upon the U.S. Trustee, according to the Court's electronic notice procedures, and that a further copy was mailed by U.S. Mail, postage prepaid, this 21st day of March, 2014, to:

Pamela K. Hicks, Attorney for Debtor
310 East Main Street
Carbondale, Illinois 62901

Dana S. Frazier, Trustee
P.O. Box 159
Murphysboro, Illinois 62966

Debra L. Rice
5495 Peony Road
Coulterville, Illinois 62237

*/S/David G. Wasinger*



CONV [X] FHA [ ] VA [ ]

## MANUFACTURED HOME RETAIL INSTALLMENT CONTRACT AND DISCLOSURE STATEMENT

| ASSIGNEE: Vanderbilt Mortgage and Finance, Inc. | Post Office Box 9800 | Maryville, | TN 37802 |
|---|---|---|---|

Buyer's Name: DEBRA L RICE                        Co-Signer's Name:

Buyer's Name: SYLVIA R HAYDEN                     Co-Signer's Name:

Buyer's Address:  808 TULIP RD  COULTERVILLE IL 62237

In this Retail Installment Contract ("Contract"), "Buyer" refers to all persons who sign this Contract as "Buyer," jointly and severally. "Seller" refers to the seller identified at the end of this Contract, and its successors and assigns. Other capitalized terms are defined in the disclosures on this page and in the section of this Contract titled, "Itemization of Amount Financed." Buyer promises to advise Seller in writing of any change of Buyer's mailing address while this Contract is in effect. Seller should send any papers or notices concerning this Contract to Buyer's mailing address. On the date of this Contract, Buyer had the option to buy the manufactured home described below, together with the related services, furnishings, equipment, appliances and accessories included with the manufactured home (collectively called "Manufactured Home") in cash or by paying in installments.  Buyer chose to buy the Manufactured Home on a credit sale basis.

**Description of Manufactured Home**          NEW [X] USED [ ]

| TRADE NAME: | CMH | ADDITIONAL ACCESSORIES AND FURNISHINGS: ITEM AND SERIAL # | |
|---|---|---|---|
| YEAR: | | | |
| MODEL: | BLUE RIDGE | | |
| SERIAL NO: | CLM091169TN | | |
| SERIAL NO: | | | |

**PROMISE TO PAY:** Buyer promises to pay Seller the "Unpaid Balance" as listed under the "Itemization of Amount Financed" plus finance charges. When Buyer signs this Contract, Buyer will also pay Seller any "Prepaid Finance Charge" shown in the "Itemization of Amount Financed." Buyer authorizes Seller to include the Prepaid Finance Charges in the Unpaid Balance. Seller will compute and charge finance charges on the unpaid amount of the Unpaid Balance from the Contract date at the yearly rate of  11.29 % (the "Contract Rate"). When Seller calculates finance charges, every year shall have 360 days and every month shall have 30 days. Buyer promises to pay finance charges at the Contract Rate on the unpaid amount of the Unpaid Balance of this Contract until it is paid in full. Finance charges after the final scheduled maturity date on this Contract, however, shall not exceed the maximum rate allowed by state law.

Buyer promises to pay Seller monthly payments in the number and amounts of payments shown in Buyer's Payment Schedule. Buyer's first payment will be due on the first date shown in Buyer's Payment Schedule, and subsequent payments will be due on the same day of each month after that.

Seller will apply each payment received as of its scheduled due date.  If on the final scheduled payment due date, Buyer still owes amounts under this Contract, Buyer will pay those amounts in full on that date (the "Maturity Date"). Buyer will make all payments to Vanderbilt Mortgage and Finance, Inc., P.O. Box 9800, Maryville, Tennessee 37802, or any other address to which Seller later tells Buyer (in writing) to send Buyer's payments.



Illinois-Retail Installment Sales Contract –4
Page 1 of 10

EXHIBIT
1



**Vanderbilt**
Mortgage and Finance, Inc.

September 29, 2010

Debra Rice
1151 State Rte. 153
Coulterville, IL 62237

Ref. Loan #: �no͟n͟e͟

## NOTICE OF CORRECTION

Dear Debra Rice                          :

On _____ 9/27/10 _____ you executed purchase and loan documents covering the purchase of a manufactured home. Your loan has been assigned to Vanderbilt Mortgage and Finance, Inc.

We have just discovered the following error in your documents:

In your: ☒ Contract ☐ Closing Agreement ☒ Escrow Agreement ☐ Biweekly Payment
☐ Purchase and Sales Agreement ☐ Authorization for Disbursement

Rider the payment due date _____

was incorrectly disclosed to you as: 11/1/10 _____.

It should have been disclosed to you as: 11/4/10 _____.

On behalf of the selling dealer and Vanderbilt Mortgage, please accept this notification as correction of the error identified above. **This requires no action on your part.** Should you have any questions, please feel free to contact us at the address and phone number shown below. Our hours of operation are Monday – Friday from 8:00 A.M. to 5:00 P.M. (ET).

Sincerely,

Vanderbilt Mortgage and Finance, Inc.

PO Box 9800, Maryville, TN 37802 • 500 Alcoa Trail, Maryville, TN 37804 • www.vmf.com
Phone: 865.380.3000 • Fax: 865.380.3750 • Toll Free: 800.970.7250

Rev. 11/08                    1-Customer   1-Attach to Contract   1-File   1-Model Home Center
Notice of Correction (1101)-All/342



FORM A

**TRUTH IN LENDING DISCLOSURES** 

| ANNUAL PERCENTAGE RATE The cost of Buyer's credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost Buyer: | Amount Financed The amount of credit provided to Buyer or on Buyer's behalf: | Total of Payments The amount Buyer will have paid after Buyer has made all payments as scheduled: | Total Sale Price The total cost of Buyer's purchase on credit including Buyer's down payment of |
|---|---|---|---|---|
| 12.41% | 87,367.40 | $50,743.00 | $138,110.40 | $500.00 $138,610.40 |

Buyer's payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly, Beginning; | | | Monthly, Beginning; | | | Monthly, Beginning; |
| 240 | $575.46 | 11/01/2010 | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Security: Buyer gives Seller a security interest in:

[X] The goods or property being purchased, including the Manufactured Home.

[X] Real property located at: 1151 STATE ROUTE 153   COULTERVILLE IL 62237

Late Charge: If a payment is more than 15 days late, Buyer will be charged 4% of the unpaid amount of such payment. Other references in this Contract to the "Late Charge" refer to this amount.

Prepayment: If Buyer pays off early, Buyer will not have to pay a penalty.

Assumption: Someone buying the Manufactured Home may be allowed to assume the remainder of Buyer's obligations under this Contract on the original terms only if such person is approved by Sellers.

Other Information: Refer to the rest of this Contract for additional information about nonpayment, default, any required payment in full before the scheduled

Illinois-Retail Installment Sales Contract – ▮▮▮▮▮▮
Page 2 of 10



**INSURANCE:**

PROPERTY INSURANCE ON THE MANUFACTURED HOME IS REQUIRED FOR THE TERM OF THIS CONTRACT. BUYER HAS THE RIGHT TO OBTAIN SUCH INSURANCE FROM ANYONE AUTHORIZED BY LAW TO SELL IT WHO IS REASONABLY ACCEPTABLE TO SELLER. By checking the appropriate box and signing below, Buyer elects to buy through Seller, property insurance of the specified coverage, term and premium.

| Type of Insurance | Term | Premium |
|---|---|---|
| [X] MobilOwners | 12 | $905.00 |
| [ ] N/A | N/A | N/A |

Buyer's signature indicates Buyer's election to obtain the above marked property insurance for the type, term, and premium shown.

Signature *Delma L Rice*          Date 9/27/10

Signature *Sylvia R Hayden*          Date 9/27/10

**OPTIONAL HOME BUYER PROTECTION PLAN (HBPP):** Buyer protection plans are <u>voluntary</u> and are <u>not</u> required to obtain credit. If the box below is checked and signed, Buyer has elected to purchase HBPP for the terms shown below.

| Type of Insurance | Term | Premium |
|---|---|---|
| [X] Home Buyer Protection Plan | 60 | $480.00 |

Buyer's signature indicates Buyer's election to obtain the above marked buyer protection plan for the term and premium shown.

Signature *Delma L Rice*          Date 9/27/10

Signature *Sylvia R Hayden*          Date 9/27/10

**SERVICE PLAN:**

**OPTIONAL HOME PROTECTION PLAN (HPP):** Service plans are <u>voluntary</u> and are <u>not</u> required to obtain credit. If the box below is checked and signed, Buyer has elected to purchase HPP for the terms shown below.

| Type of Insurance | Term | Premium |
|---|---|---|
| [ ] N/A | N/A | N/A |

Buyer's signature indicates Buyer's election to obtain the above marked service plan for the term and cost shown.

Signature _____          Date _____

Signature _____          Date _____

Illinois-Retail Installment Sales Contract – ▉▉▉▉▉
Page 3 of 10

## ITEMIZATION OF AMOUNT FINANCED

| | | | |
|---|---|---|---|
| 1. Cash Price | | | |
| | a. Manufactured Home including Sales Tax of | $2,869.00 | $48,769.00 |
| | b. | | |
| | c. Total Cash Price | | $48,769.00 |
| 2. Downpayment | | | |
| | a. Cash Downpayment | | $500.00 |
| | Trade-in (Year, Make, Model)   N/A   N/A | | |
| | Length   N/A          Width   N/A | | |
| | Trade Allowance N/A        Liens   N/A | | |
| | b. Net Trade-in Allowance | | $.00 |
| | c. Total Downpayment | | $500.00 |
| | d. | | |
| 3. Unpaid Balance of Cash Price (1c minus 2c and 2d) | | | $48,269.00 |
| 4. Amounts paid to others on Buyer's behalf | | | |
| | (1) To Insurance Companies | | |
| | (a) Property Insurance | | $905.00 ** |
| | (b) Home Buyer Protection Plan | | $450.00 ** |
| | (2) To Public Officials | | |
| | (a) Certificate of Title | | $95.00 |
| | (b) Filing/Recording Fees | | $85.00 |
| | (3)   To | | $.00 ** |
| | (4)   To | | $.00 ** |
| | (5)   To | | $.00 ** |
| | (6)   To | | $.00 ** |
| | (7)   To   APPRAISAL FEE | | $425.00 ** |
| | (8)   To | | $.00 ** |
| | (9)   To   TITLE SEARCH | | $290.00 ** |
| | (10)  To | | $.00 ** |
| | (11)  To | | $.00 ** |
| | (12)  To | | $.00 ** |
| | (13)  To | | $.00 ** |
| | (14)  To   TITLE INSURANCE | | $194.00 ** |
| | Total (Items (1) through (14)) | | $2,474.00 |
| 5. Prepaid Finance Charges (may include items paid to third parties; items may be financed in part and paid in cash in part) | | | |
| | (1) Financed | | |
| | (a)   ORIGINATION FEE | | $1,014.86 ** |
| | (b)   DISCOUNT POINTS | | $2,537.15 ** |
| | (c) | | $.00 ** |
| | (d)   ATTORNEY FEE | | $407.00 ** |
| | (e) | | $.00 ** |
| | (f) | | $.00 ** |
| | (2) Paid in cash | | |
| | (a) | | $.00 ** |
| | (b) | | $.00 ** |
| | (c) | | $.00 ** |
| | (d) | | $.00 ** |
| | (e) | | $.00 ** |
| | (f) | | $.00 ** |
| 6. Unpaid Balance (3 plus 4 plus total of items in 5(1)) | | | $54,702.01 |
| 7. Prepaid Finance Charges (total of all items in 5) | | | $3,959.01 |
| 8. Amount Financed (6 minus 7) | | | $50,743.00 |
| **Seller may retain, or receive, a portion of these amounts | | | |
| Security interest fees paid in cash (including filing fees and taxes) | | | $.00 |

Security interest termination, release, discharge or satisfaction fees paid upon termination: $180.00    (e). This fee is not being paid by Buyer at closing, and is estimated for disclosure purposes. The actual amount paid at the time of termination of the security interest may be more or less than the estimate depending on the amount charged by the public official.
"e" means estimate

**SECURITY INTEREST:** To secure payment ⬤ sums due or which become due under this Contract, ⬤ buyer's performance of all other terms of the Contract, Buyer grants Seller a first priority security interest in (1) the Manufactured Home, and all accessions, attachments, accessories, replacements and additions to the Manufactured Home, whether added now or later, (2) the "Property" described in any mortgage or deed of trust Buyer gives to Seller, (3) Buyer's rights to refunds of premiums for and payments under, and proceeds of any insurance or any extended warranty or service contract purchased with the proceeds of this Contract, (4) any amounts held in escrow by Seller for Buyer, and (5) proceeds and products of all of the foregoing (collectively, the "Collateral"). Seller's security interest shall remain in effect until Buyer pays, in full, all amounts due under the Contract. Despite any other provision of the Contract, however, Seller is not granted, and does not have, a nonpurchase money security interest in household goods, to the extent such a security interest is prohibited by applicable law. Buyer will pay any filing or recording fees necessary for Seller to obtain and hold a first priority security interest. To the extent allowed by law, Buyer also agrees to pay any release, discharge or termination fees, after the Buyer pays the Contract in full. Buyer agrees to execute any application for certificate of title or ownership, financing statement or other document necessary to perfect Seller's security interest in the Manufactured Home. Buyer authorizes Seller to sign Buyer's name to any financing statement or application or other document, necessary to perfect the security interest granted by Buyer herein. If Seller is taking a security interest in real property, such interest is reflected in a mortgage or deed of trust signed in conjunction with this Contract.

## BUYER'S RIGHT TO PREPAY: BUYER MAY PREPAY ANY AMOUNTS DUE UNDER THIS CONTRACT AT ANY TIME WITHOUT

PENALTY. A Principal only payment is known as a "Prepayment." Seller will not treat a payment as a Prepayment unless the Buyer previously made all monthly payments of principal and finance charges and fully paid and satisfied all other obligations due under this Contract. If the Buyer meets these conditions, Buyer may make a Prepayment by sending such Prepayment in accordance with the written instructions provided by Seller in a monthly billing statement or otherwise. Buyer may make a full Prepayment or partial Prepayments without paying a Prepayment charge. If Buyer (1) prepays this Contract in full, or (2) defaults and fails to cure the default and Seller demands payment of the entire balance due on this Contract, no portion of any Prepaid Finance Charge will be refunded. All Prepaid Finance Charges are earned at the time this Contract is made.

**ASSUMPTION:** Someone buying the Manufactured Home may assume the remainder of Buyer's obligations under this Contract on the original terms only if such person is approved by Seller.

**PROPERTY INSURANCE:** Buyer is required to insure the Manufactured Home against physical damage, including loss by fire, hazards included within the term "extended coverage," and any other hazards for which Seller requires insurance, for the term of the Contract at Buyer's expense. If Buyer financed the premium, the premium is financed over the term of the Contract, even though the term of insurance is less than the Contract term. The Buyer must obtain the types and amounts of insurance coverage required by Seller, including flood insurance if applicable. The insurance policy must contain a loss payable clause protecting Seller (as Seller's interest may appear), and provide for at least a 10 day notice of cancellation to Seller. Buyer agrees to provide written proof of such coverage to Seller within 5 days of Seller's request. BUYER HAS THE RIGHT TO CHOOSE THE PERSON THROUGH WHOM THE PROPERTY INSURANCE IS OBTAINED. Seller reserves the right to refuse to accept, for reasonable cause, an insurer chosen by the Buyer. If Buyer's insurance coverage expires or is canceled prior to payment in full of this Contract, Buyer must obtain coverage in the amounts, types, and for the periods that Seller requires at Buyer's expense for the remaining term of the Contract. Seller's property insurance coverage requirements can change during the term of the Contract. Should Buyer fail to provide or maintain property insurance or fail to provide Seller with satisfactory evidence of coverage, or should the property insurance, for any reason, not protect Seller's interests, Seller, in its sole discretion, may obtain property insurance that meets its requirements, but is under no legal obligation to do so. Before obtaining insurance in these circumstances, Seller will, in good faith, attempt to inform Buyer in writing of the need for Buyer to obtain property insurance and/or to provide evidence thereof. If obtained by Seller, Seller will add the cost of the insurance to the amount due under the Contract. That amount will become due and payable upon demand by the Seller, in payments added to Buyer's scheduled payments, or as otherwise required by Seller. Seller may charge Buyer finance charges on such cost at the Contract Rate, unless prohibited by applicable law. The property insurance obtained by Seller may have material differences from insurance initially financed under the Contract or from insurance obtained by the Buyer initially or at any time during the term of the Contract. Such insurance may be significantly more expensive to Buyer than if Buyer obtained the insurance. Consequently, Seller makes the following disclosures to Buyer: (a) The property insurance that Seller obtains is intended solely to protect the Seller's interest hereunder, and Seller may not obtain coverages beyond those to insure loss of or damage to the Manufactured Home; in particular, such insurance may not provide coverage for personal effects, adjacent structures, medical expenses or personal liability; additionally, such coverage may not insure the Manufactured Home in an amount equal to the Unpaid Balance due under this Contract and, consequently, in the event of loss or damage, the insurance may not pay the full amount of the Unpaid Balance of the Contract; (b) If Seller obtains this insurance due to Buyer default, Buyer acknowledges and agrees that Seller has no duty to obtain insurance on behalf of Buyer which is the least expensive, or which has a competitive marketplace premium or any other particular feature; (c) Seller or its affiliates may be reimbursed for expenses and may profit from taking action to cure Buyer's default by providing and maintaining such insurance; (d) Buyer's execution of this Contract authorizes Seller to provide third parties with any information necessary to obtain insurance on the Manufactured Home and monitor the status of such insurance; and (e) Buyer may, as stated above, at any time, including after Seller obtains property insurance on Buyer's behalf, obtain insurance through an agent or insurer of Buyer's choice. Upon so doing, Buyer may provide Seller with sufficient evidence of insurance coverage, at which time, Seller will cancel the insurance coverage it obtained on Buyer's behalf, obtain any refund due on the unearned portion of the premium, and apply the refund to the Unpaid Balance of the Contract. Property insurance proceeds (whether such insurance has been obtained by Buyer or Seller) shall be applied to the restoration or repair of the Manufactured Home, if it is economically feasible and does not lessen the Seller's security interest in the Manufactured Home. If this is not the case, or if the Insurer determines that the Manufactured Home represents a total loss under the coverage, Seller will apply such insurance proceeds to reduce all amounts owing under this Contract, whether or not such amounts are due and payable. Buyer authorizes Seller to (a) adjust or settle Buyer's claim for loss under such insurance; (b) sign Buyer's name to any check, draft or other documents necessary to obtain such insurance proceeds; and (c) hold such insurance proceeds until Seller has the opportunity to inspect the Manufactured Home and ensure that work to restore or repair the Manufactured Home is completed to Seller's satisfaction, without incurring an obligation to pay Buyer earnings or interest on such proceeds. Seller may disburse proceeds in a single payment or a series of payments and Buyer authorizes any insurer to make such payment directly to Seller. If insurance proceeds paid to Seller do not satisfy all amounts Buyer owes to Seller under this Contract, Buyer is responsible for paying the balance.



**ESCROW ITEMS:** To the extent permitted by law, Seller may, at Seller's option, require Buyer to make payments in addition to those set forth in Buyer's Payment Schedule ("Escrow Payments") which Seller will collect and hold for (1) the payment of property insurance premiums required under this Contract, (2) the payment of taxes and assessments, and (3) other items which might attain priority over Seller's security interest (each, an "Escrow Item"). Seller will use Buyer's Escrow Payments to pay Escrow Items as they come due. **THE BUYER'S PAYMENT SCHEDULE IN THIS CONTRACT DOES NOT INCLUDE ANY AMOUNT TO BE PAID UNDER ANY SUCH ESCROW ACCOUNT.**

**SERVICING CHARGES:** Buyer agrees to pay all reasonable charges for Seller's performance of additional services requested by Buyer in connection with the servicing of this Contract, to the extent permitted by applicable law. These charges may include, but are not limited to, amortization schedule fee, document copy fee, duplicate year end statement fee, name change fee, payoff statement fee, pay-by-phone fee or convenience fee (if Buyer elects to make a payment in a manner where such a fee is imposed, including but not limited to a wire transfer, electronic transfer, or through a web site), payment history fee, short payoff overnight fee and verification of credit fee and verification of mortgage fee.

**ADVANCES TO PROTECT THE COLLATERAL:** If Buyer fails to pay for required insurance, if Buyer fails to pay park or lot rent (and any other related charges), if Buyer fails to satisfy taxes, assessments, or other liens or encumbrances against the Manufactured Home, if Buyer fails to keep the Manufactured Home in good repair or if Buyer fails to make any other payments required by this Contract or applicable law, Seller may (but is not required to) make such repairs or payments as Seller chooses. Seller will add any and all such payments and any amounts Seller pays to protect or enforce Seller's security interest to the amount Buyer owes Seller under this Contract, and all such amounts will be secured by the Collateral. At Seller's sole option, Seller may (1) demand that Buyer repay these amounts immediately, or (2) add these amounts to Buyer's regularly scheduled payments, or (3) add these amounts as additional installments due or (4) add these amounts to the final installment due on this Contract. Unless prohibited by law, Buyer agrees to pay finance charges at the Contract Rate on any amounts that Buyer does not repay immediately.

**DELINQUENCY AND DEFAULT:** Time is of the essence. If a payment is more than 15 days late, Buyer agrees to pay the Late Charge indicated in the "Truth in Lending Disclosures" section of this Contract. If any check, negotiable instrument of withdrawal, electronic payment draft or any other instrument is dishonored by Buyer's financial institution, Buyer will pay a fee of $20.00, in addition to being required to make payment on the item. Buyer will be in default under this Contract if: (1) Buyer fails to make any payment when due; (2) Buyer otherwise fails to perform any of Buyer's obligations under this Contract or under any mortgage or deed of trust which secures this Contract; (3) Buyer dies or becomes legally unable to manage Buyer's affairs; (4) any statement of fact, representation or warranty Buyer makes to Seller in Buyer's application for credit, any other document submitted to the Seller or signed by Buyer in connection with this Contract, or in any Contract document is false, misleading, inaccurate, or incomplete; or (5) Buyer files a petition in bankruptcy, or a party files a petition in bankruptcy against Buyer. In the event of Buyer's default, Seller will give Buyer notice of the default and right to cure the default ("Notice of Default"). Buyer is not entitled to a Notice of Default if Buyer abandons or voluntarily surrenders the Manufactured Home, or if other extreme circumstances exist. Buyer is not, under any circumstances, entitled to a Notice of Default more than twice in any one year period. If Buyer does not cure the default within 30 days after the postmarked date of the Notice of Default, or if a Notice of Default is not required to be sent, Seller may (1) accelerate the maturity of the debt and require Buyer to pay Seller the entire remaining balance and all other amounts due under the Contract, (2) require Buyer to make the Manufactured Home available to Seller, (3) take legal action against Buyer, (4) repossess the Manufactured Home, (5) enforce such rights and remedies available to Seller under the uniform commercial code and other applicable law, and (6) foreclose on the real property, if applicable. Seller, at its sole option, may elect to sever and remove the Manufactured Home from any real property where it is located, regardless of whether the real property secures this Contract. In the event of default, Buyer also agrees to pay Seller's expenses for (a) reasonable attorney's fees not to exceed 15% of Buyer's Unpaid Balance after referral to an attorney who is not a salaried employee of the Seller; (b) court costs and disbursements; and (c) costs of repossessing the Manufactured Home including the costs of storage, reconditioning, and resale. Before Seller sells the Manufactured Home, Buyer can get the Manufactured Home back if Buyer either (1) pays off the Contract by paying Seller the entire remaining balance and all other amounts due under the Contract (redeem), or (2) cures the default by paying Seller the amounts which are past due, including Late Charges (reinstate). Regardless of whether Buyer redeems or reinstates, and before Buyer can get the Manufactured Home back, Buyer must also (1) pay Seller the cost of taking, storing and redelivering the Manufactured Home and other expenses Seller incurs; (2) pay Seller all other charges and other expenses provided for under this Contract; (3) pay any amounts advanced by Seller to protect the Collateral, without regard to any agreement to repay such amounts advanced on a periodic basis, including but not limited to unpaid insurance premiums, park or lot rent, taxes, assessments or similar items; and (4) cure any other defaults. Buyer's rights to redeem and/or reinstate end upon sale of the Manufactured Home unless otherwise required by law. All rights and remedies under this Contract and any mortgage or deed of trust executed herewith are cumulative, but Buyer's right to a written notice of default and 30 days to cure, as set forth in this Contract, shall not be affected by any inconsistent provision of any mortgage or deed of trust. Any personal property of Buyer's located in or attached to the Manufactured Home and not subject to Seller's security interest may be held by Seller without liability if the Seller repossesses the Manufactured Home. Buyer will be deemed to have waived any claim to such personal property unless written demand by certified mail is made upon Seller within twenty-five (25) days after repossession. If Buyer fails to give Seller such written demand, Seller may dispose of such personal property.

**INFORMATION SHARING:** Seller may investigate Buyer's credit history and credit capacity in connection with establishing, modifying, extending, and/or enforcing Buyer's account, and share information about Buyer's account with credit reporting agencies and others as allowed by law. Seller may also verify Buyer's employment, income, assets, and debts; and anyone receiving a copy of this Contract is hereby authorized to release such information to Seller. Buyer authorizes Seller to release to third parties any information necessary to monitor the status of insurance on Buyer's Manufactured Home, and to obtain the insurance described in this Contract. If Buyer's Manufactured Home is on rented property or property that is not owned by Buyer, Buyer authorizes Seller and Buyer's landlord (or the property owner) to exchange information as to Seller's security interest in Buyer's Manufactured Home and the lease or arrangement, as well as to the obligations, and the status of such obligations, of Buyer to Seller under this Contract. Whether or not the Buyer rents the Manufactured Home is a party in accordance with the terms of this Contract, Buyer authorizes Seller and Buyer's renter to exchange information as to Seller's security interest in Buyer's Manufactured Home and the rental agreement or arrangement, as well as to the obligations, and the status of such obligations of Buyer to Seller under this Contract. This provision also applies to any co-signor who executes this Contract.

Illinois-Retail Installment Sales Contract —
Page 6 of 10





**OTHER TERMS AND CONDITIONS:** Buyer will not move the Manufactured Home without Seller's prior written consent. Buyer will not sell the Manufactured Home without Seller's prior written consent. Buyer agrees that the Manufactured Home is, and shall remain, during the term of this Contract, personal property. Unless Seller gives prior written consent, Buyer shall not allow the Manufactured Home to become a part of real estate or to lose its status as personal property under applicable law. Buyer will not encumber or abandon the Manufactured Home, nor allow any lot lien, landlord lien, or similar lien, which may by law be superior to Seller's security interest, to encumber the Manufactured Home. Buyer will not use the Manufactured Home for illegal activity. Buyer will not use the Manufactured Home for business or hire, or rent it to another party, without obtaining Seller's prior written consent. Buyer will pay promptly all taxes, assessments, and any liens and encumbrances on the Manufactured Home. Buyer will notify Seller promptly of any loss or damage to the Manufactured Home, as well as any condemnation, confiscation or theft of the Manufactured Home. Upon Seller's request, Buyer will promptly provide Seller with proof satisfactory to Seller that: (1) Buyer has the insurance required under this Contract; (2) Buyer has paid all taxes assessed against the Manufactured Home; (3) Buyer has paid all park or lot rent (and any other related charges) due; (4) Seller holds the only lien against the Manufactured Home; (5) the Manufactured Home is in good condition and repair; and (6) Buyer has complied with all of the promises Buyer made in this Contract. Seller may inspect the Manufactured Home at any time. If Buyer is married, and residing in a community property state, both Buyer's community property and separate property are liable for all payments under this Contract. Buyer waives all marital rights, homestead exemption and other exemptions relating to the Collateral. Buyer will cooperate with Seller regarding any requests after closing to correct any errors with respect to this Contract or the transaction and agrees to provide any and all additional documentation deemed necessary by Seller to complete this transaction. Seller may rely on a telecopy, photocopy, or electronically imaged copy of this Contract as if it were an original, including use in legal proceedings or arbitrations. Buyer acknowledges that any broker or other third party used to facilitate this transaction may receive compensation from Seller for its services. If Borrower purchased a Home Buyer Protection Plan (HBPP) or Home Protection Plan (HPP), the cost is financed over the term of the Contract, even though the term of the plan is shorter than the Contract term.

**WAIVER AND MODIFICATION:** Seller's waiver of any default shall not constitute a waiver of any other default. The procurement of required property insurance, or the payment of taxes, or other liens, or other charges, by Seller shall not be a waiver of Seller's right to accelerate the maturity of this Contract and declare default herein. To the extent permitted by law, Buyer agrees to give up Buyer's rights to require Seller to do certain things. Buyer does not give up any rights that are provided in this Contract. Unless the law or this Contract provides otherwise, Seller is not required to: (1) demand payment of amounts due; (2) give notice that amounts due have not been paid, or have not been paid in the appropriate amount, time, or manner; or, (3) give notice that Seller intends to make, or is making, this Contract immediately due.

**WARRANTIES:  SELLER MAKES NO WARRANTIES ON THE MANUFACTURED HOME, AND EXPRESSLY EXCLUDES ANY EXPRESS OR IMPLIED WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, UNLESS GIVEN TO BUYER BY SELLER IN WRITING AT THE TIME OF SALE, OR SELLER ENTERS INTO A WRITTEN SERVICE CONTRACT WITH BUYER WITHIN 90 DAYS FROM THE DATE OF THIS CONTRACT.  BUYER AGREES THAT THE YEAR OF THE MANUFACTURED HOME IS FOR IDENTIFICATION PURPOSES ONLY AND MAY NOT BE THE BASIS FOR A WARRANTY OR OTHER CLAIM AGAINST SELLER. THE ABOVE DISCLAIMERS DO NOT AFFECT ANY WARRANTIES COVERING THE MANUFACTURED HOME THAT MAY BE PROVIDED BY THE MANUFACTURER, OTHER THIRD PARTIES, OR THAT ARE REQUIRED BY LAW.**

**VALIDITY AND EFFECTIVENESS:** Wherever possible each provision of this Contract shall be interpreted in such a manner as to be effective and valid under applicable law. If any provision of this Contract is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, however, the remainder of such provision or the remaining provisions of this Contract shall not be invalidated. The Contract has been delivered in the state of Seller's place of business, as indicated below, and shall be governed both as to issues of formation and performance by the laws of that state and applicable federal law. This Contract shall have no effect until and unless signed by Buyer and Seller. Seller does not intend to charge or collect any finance charge, charge, or fee greater than the law allows. If Seller charges or collects any amount greater than what the law allows, Seller will apply the excess to the Unpaid Balance and any other amounts due under the Contract and shall refund any excess. Seller will treat any amount applied to the Unpaid Balance as a partial Prepayment.

**ASSIGNMENT:** The retail buyer hereunder has been informed by the retail seller that his contract will be sold and assigned by the retail seller to, Vanderbilt Mortgage and Finance, Inc., (a licensed Sales Finance Agency) and that the said Sales Finance Agency has a substantial interest in the business of the retail seller and that pursuant to law the retail buyer may assert all defenses equally against the retail seller and said, Sales Finance Agency.

**ENTIRE AGREEMENT:** This Contract, any separate written warranty, the Retailer Closing Agreement, escrow agreement, sales/purchase agreement, and any mortgage or deed of trust, together, the "Entire Agreement Documents", shall constitute the entire agreement between Buyer and Seller. To the extent permitted by applicable law, Buyer agrees that no representations, oral or written, have been made to Buyer to induce Buyer to enter into the Entire Agreement Documents, except as set forth therein.

**GUARANTY:** Any Co-Signer signing the guaranty of this Contract agrees that all amounts owed under this Contract will be paid when due. Co-Signer's obligation continues even if Buyer is released or if Seller waives or delays enforcement of any rights under this Contract. Seller need not give Co-Signer notice of any such waiver, delay or release. See Notice to Co-Signer before signing this guaranty.

THIS SPACE LEFT INTENTIONALLY BLANK.

Illinois-Retail Installment Sales Contract -- 
Page 7 of 10

## ARBITRATION:



**A. Agreement to Arbitrate:**  Buyer and Seller (sometimes called the "Parties") agree to mandatory, binding arbitration ("Arbitration") of all disputes, claims, controversies, grievances, causes of action, including, but not limited to, common law claims, contract and warranty claims, tort claims, statutory claims, and, where applicable, administrative law claims, and any other matter in question ("Claims") arising from or relating to this Contract, any products/goods, services, insurance, or real property (including improvements to the real property) sold or financed under this Contract, any events leading up to this Contract, the collection and servicing of this Contract, and the interpretation, scope, validity or enforceability of this Contract (with the exception of this agreement to arbitrate, the "Arbitration Agreement"). The interpretation, scope, validity or enforceability of this Arbitration Agreement or any clause or provision herein and the arbitrability of any issue shall be determined by a court of competent jurisdiction. Buyer and Seller agree that the scope of this Arbitration Agreement is intended to cover only Claims brought by Buyer on an individual basis and not on a representative basis as a class action, which includes similar actions that involve the aggregation of individual Claims of Buyer and other persons into a single proceeding. Notwithstanding any other provision of this Arbitration Agreement or any determination as to the enforceability of this Arbitration Agreement or the arbitrability of any Claims, Buyer and Seller expressly agree not to arbitrate any Claims as a class action. This Arbitration Agreement is the only agreement between Buyer and Seller regarding Arbitration, and takes the place of any other agreements to arbitrate.

If Buyer has Claims against others (each, a "Third Party") related to or arising from facts or circumstances covered by this Arbitration Agreement (including, but not limited to (i) the design, construction and manufacture of the Manufactured Home, (ii) the advertising and the sale of the Manufactured Home, (iii) the delivery or the installation of the Manufactured Home, and (iv) insurance covering the Manufactured Home or Buyer, including title insurance, where applicable (each, a "Related Claim")), then Buyer and Seller agree to consolidate the Arbitration of Buyer's Claims against Seller, brought on an individual basis, with the Arbitration of any and all Related Claims, brought on an individual basis, into one Arbitration to be governed by this Arbitration Agreement, *provided, however,* that the Third Party must agree to be joined in the Arbitration of the Related Claims under this Arbitration Agreement. If any Third Party does not agree to be joined in the Arbitration of its Related Claim, then Arbitration under this Arbitration Agreement shall proceed without that Third Party. Buyer agrees not to arbitrate any Related Claims as a class action. This Arbitration Agreement also covers all co-signors and guarantors who sign this Contract and any occupants of the Manufactured Home (as intended beneficiaries of this Arbitration Agreement). Buyer agrees that the Manufactured Home contains parts manufactured outside of the state where the home is sold and delivered; the manufacture, transportation, sale and use thereof has been and will continue to be regulated by the laws of the United States of America and involve and affect interstate commerce.

**B. Facts About Arbitration:**  Arbitration is a process in which a neutral arbitrator decides a dispute instead of a judge or jury. Each side has an opportunity to present evidence to the Arbitrator, both in writing and through witnesses. Arbitration proceedings are less formal than court trials. Other rights that the Parties have in court may not be available in Arbitration. The information that can be obtained in discovery from each other or from third persons in Arbitration is generally more limited than in a lawsuit. An Arbitrator will decide the case by issuing a written decision called an "award." Once confirmed, an award may be enforced as a court judgment in accordance with federal or state law. The circumstances under which a court can review an award are more limited in Arbitration.

**C. Rules:**  The Arbitration shall be governed by and conducted under: (a) the Federal Arbitration Act, 9 U.S.C. §§ 1_9; (b) the arbitration rules ("Arbitration Rules") of the American Arbitration Association ("AAA") (the "Arbitration Administrator") in effect at the time Arbitration is requested, at the election of the Party filing for Arbitration; and (c) this Arbitration Agreement. A copy of the Arbitration Rules may be obtained, free of charge, from the AAA, on the Internet at www.adr.org, by calling 800-778-7879, or by writing to - American Arbitration Association, 1633 Broadway, 10th Floor, New York, NY 10019. If the terms of this Arbitration Agreement and the Arbitration Rules conflict, the terms of this Arbitration Agreement shall control to the extent of the conflict. The person who conducts the Arbitration (the "Arbitrator") shall have all powers provided by the Arbitration Rules and this Arbitration Agreement. After the Arbitrator is selected, the Arbitrator, in accordance with the Arbitration Rules, will set a reasonable schedule, in light of the nature and complexity of the Claims, for the Arbitration and discovery, including any depositions, the exchange of written documents, the final deadline for discovery prior to the Arbitration, and other discovery matters addressed in the Arbitration Rules. The Arbitration shall be conducted in the largest city in the federal judicial district where Buyer resides, or at any other place mutually acceptable to Buyer and Seller. At the election of either Buyer or Seller (and at the expense of the electing party), the Arbitration may be recorded and transcribed by a court reporter. Judgment upon the award rendered may be entered in any court having jurisdiction. The Parties agree that information exchanged in the Arbitration shall be held confidentially, and shall not be used in other arbitrations or court proceedings. All statutes of limitation that would otherwise apply to a Claim in a judicial action shall apply to the Arbitration of that Claim under this Arbitration Agreement. The Arbitrator shall apply applicable substantive law and shall honor claims of privilege recognized at law and consider defenses that a court could consider. The Arbitrator's decision shall be in writing, and shall include the Arbitrator's reasons for the award, including detailed findings of fact and conclusions of law. The Arbitrator may award the prevailing party in the Arbitration with that party's reasonable attorney's fees and any fees paid to commence the Arbitration, including the Arbitrator's fees, if such are available under applicable law. Any Claim or counter-claim (including compulsory or permissive under law) of a party must be made in the Arbitration, and the failure to bring such Claim or counterclaim shall constitute a waiver of and a bar to bringing such claim or counterclaim in an later Arbitration or action in court.

**D. Fees and Costs:**  The fees and costs imposed by the Arbitration Administrator associated with the Arbitration, including the Arbitrator's fees, shall be paid in accordance with the Arbitration Rules and this Arbitration Agreement. Buyer may request that the Arbitration Administrator reduce or waive Buyer's fees, or that Seller voluntarily pay an additional share of the fees and costs (however, such request does not obligate Seller to do so), based upon Buyer's financial circumstances or the nature of Buyer's Claim.

**E. Class Action Waiver:**  Buyer waives the right to participate as a representative or member in a class action or otherwise join Buyer's Claims with those of any other person.

F. Joinder of Arbitrations: Except as provided expressly in Paragraph A. of this Arbitration Agreement with respect to the Arbitration of Buyer's Individual Related Claims, Buyer and Seller agree to give up any right to consolidate or join any individual Arbitration with the Arbitration of others.

G. Exceptions: Notwithstanding any other provision of this Arbitration Agreement, Buyer agrees that Seller may use judicial process (filing a lawsuit): (a) to enforce the security interest granted in this Contract or any related mortgage or deed of trust, and (b) to seek preliminary relief, such as a restraining order or injunctive relief, in order to preserve the existence, location, condition, or productive use of the Manufactured Home or other Collateral. Buyer and Seller also agree that this Arbitration Agreement does not apply to any Claim where the amount in controversy is less than the jurisdictional limit of the small claims court in the jurisdiction where Buyer resides, *provided, however*, that the Parties agree that any such small claims Claim may only be brought on an individual basis and not as a class action. Bringing a court proceeding described in this paragraph G., however, shall not be a waiver of Seller's or Buyer's right to compel Arbitration of any other Claim that is covered by this Arbitration Agreement, including Buyer's counterclaim(s) in a suit brought by Seller. Buyer and Seller give up the right to serve as a private attorney general in any jurisdiction in which such procedure might be permitted.

H. Severability: If it is determined that any paragraph or provision in this Arbitration Agreement (other than the Class Action Waiver in paragraph E., the agreement with respect to joinder of Arbitrations in paragraph F., or the agreement of Buyer and Seller not to arbitrate class actions generally) is illegal, invalid, or unenforceable, such illegality, invalidity or unenforceability shall not affect the other paragraphs and provisions of this Arbitration Agreement and the remainder of this Arbitration Agreement shall continue in full force and effect as if the severed paragraph or provision had not been included. Notwithstanding this severability provision or any other provision of this Contract or Arbitration Agreement, if a court of competent jurisdiction finally determines the Class Action Waiver in paragraph E., the agreement with respect to joinder of Arbitrations in paragraph F., or the agreement of Buyer and Seller not to arbitrate class actions generally, to be illegal, invalid, or unenforceable, then the Parties agree that such waiver shall not be severed and that this Arbitration Agreement shall be void in its entirety without effect on the remainder of this Contract.

I. Survival of Arbitration Agreement: This Arbitration Agreement will survive and continue in full force and effect notwithstanding rescission, cancellation, termination, amendment, payment in full, discharge in bankruptcy, or other expiration or conclusion of this Contract or any other contract or transaction between the Parties, unless otherwise agreed to in writing by the Parties. In addition, Buyer understands and acknowledges that the rights afforded to Seller under this Arbitration Agreement survive any assignment of this Contract by Seller and that Seller can enforce this Arbitration Agreement in the event a Claim arises after the assignment of this Contract.

J. Rules of Construction: If there is a disagreement on the interpretation of this Arbitration Agreement, this Arbitration Agreement shall be construed to require Arbitration, rather than to defeat it, except for class actions, which the Parties agree not to arbitrate. Buyer and Seller waive the rule of construction that requires a tribunal to construe a vague or ambiguous provision against the drafting party.

K. Jury Waiver: Buyer and Seller hereby expressly and irrevocably waive any right to a trial by judge or jury of any Claims covered by this Arbitration Agreement. This waiver will remain enforceable even if any portion of the Arbitration Agreement is otherwise found to be unenforceable. The Parties agree that this waiver is made knowingly, willingly, and voluntarily.

L. NOTICE: BUYER UNDERSTANDS THAT THIS ARBITRATION AGREEMENT IS AN IMPORTANT AGREEMENT AND THAT THE TERMS OF THIS ARBITRATION AGREEMENT AFFECT BUYER'S LEGAL RIGHTS. BY SIGNING THIS CONTRACT, BUYER ACKNOWLEDGES THAT BUYER HAS READ, UNDERSTANDS AND AGREES TO BE BOUND BY THIS ARBITRATION AGREEMENT. IF BUYER DOES NOT UNDERSTAND ANY OF THE TERMS OR PROVISIONS OF THIS ARBITRATION AGREEMENT, INCLUDING ADVANTAGES OR DISADVANTAGES OF ARBITRATION, THEN BUYER SHOULD SEEK INDEPENDENT LEGAL ADVICE BEFORE SIGNING THIS CONTRACT.

To contact Vanderbilt Mortgage and Finance, Inc. about this account call (865) 380-3000 or (800) 970-7250.

THIS SPACE LEFT INTENTIONALLY BLANK

 

## NOTICE

**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR (BUYER) COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR (BUYER) SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR (BUYER) HEREUNDER.**

**NOTICE TO THE BUYER:** DO NOT SIGN THIS CONTRACT BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACES. YOU ARE ENTITLED TO AN EXACT COPY OF THE CONTRACT YOU SIGN. UNDER THE LAW YOU HAVE THE RIGHT, AMONG OTHERS, TO PAY IN ADVANCE THE FULL AMOUNT DUE AND TO OBTAIN UNDER CERTAIN CONDITIONS A PARTIAL REFUND OF THE FINANCE CHARGE.

**SELLER'S AGREEMENT AND ASSIGNMENT:** Seller agrees to this Contract, and subject to acceptance by Vanderbilt Mortgage and Finance, Inc. at its designated office (located at 500 Alcoa Trail, Maryville, Tennessee 37804), assigns to Vanderbilt Mortgage and Finance, Inc., (the "Assignee"), all its right, title and interest therein, and the Collateral and real property security therefore, in accordance with the assignment set forth herein. Notice of acceptance is hereby waived.

IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS CONTRACT BEFORE YOU SIGN IT. THE ANNUAL PERCENTAGE RATE MAY BE NEGOTIABLE WITH THE SELLER. THE SELLER MAY ASSIGN THIS CONTRACT AND RETAIN THE RIGHT TO RECEIVE A PART OF THE FINANCE CHARGE.

**RETAIL INSTALLMENT CONTRACT**

YOU ACKNOWLEDGE THAT ON _9-27-10_ , YOU READ, SIGNED AND RECEIVED A COMPLETED COPY OF THIS RETAIL INSTALLMENT CONTRACT.
Executed by the parties this 27th day of _September_ _2010_
(Month)      (Year)

Seller   **CLAYTON HOMES PINCKNEYVILLE**

By _____ General Mgr. _____
(Signature)              (Title)(Corporate Seal)

BUYERS(S): _Debra L Rice_
(Buyer)   DEBRA L RICE

_Sylvia R Hayden_
(Buyer)   SYLVIA R HAYDEN

Seller's
Address   **900 WEST WATER STREET**

**PINCKNEYVILLE , IL**
(City)              (State)

_Rebecca Houston_
_CMH Homes, Inc_

**GUARANTY OF BUYER'S PROMISES:** The undersigned, separately and together, agree(s) to pay all amounts due on this Contract until all amounts due on this Contract are paid in full. The undersigned also agree(s) to all the terms and conditions of this Contract.

_____
(Co-Signer)

_____
(Co-Signer)

I (we), hereby guarantee the collection of the above described amount upon failure of the seller named herein to collect said amount from the buyer named herein.

VANDERBILT MORTGAGE AND FINANCE, INC., having been assigned this Contract, hereby assigns to _____
_____ the foregoing Contract, including all amounts payable by Buyer and the security interest in the Collateral, without recourse.

Date: _9-27-10_   By _Pamela Finnegan_ Title _Closing Officer_

## STATE OF ILLINOIS

## CERTIFICATE OF TITLE OF A VEHICLE

| VEHICLE IDENTIFICATION NO. | YEAR | MAKE | MODEL | BODY STYLE | TITLE NO. |
|---|---|---|---|---|---|
| CLM091169TN | 2010 | CLAYTON | | MOBILE HM | X0288772022 |

| DATE ISSUED | ODOMETER | CCM | MOBILE HOME SQ. FT. | PURCHASED | TYPE OF TITLE |
|---|---|---|---|---|---|
| 10/15/10 | | | 2128 | 09/27/10 NEW | ORIGINAL |

MAILING ADDRESS

VANDERBILT MORTGAGE & FINANCE INC
PO BOX 4007
MARYVILLE TN 37802-4007

LEGEND(S)

OWNER(S) NAME AND ADDRESS

MILEAGE NOT REQUIRED

DEBRA L RICE
SYLVIA R HAYDEN
1151 STATE ROUTE 153
COULTERVILLE IL 62237

FIRST LIENHOLDER NAME AND ADDRESS

VANDERBILT MORTGAGE & FINANCE INC
PO BOX 4007
MARYVILLE TN 37802-4007

SECOND LIENHOLDER NAME AND ADDRESS

**RELEASE OF LIEN**

The Lienholder on the vehicle described in this Certificate does hereby state that the lien is released and discharged.

| Firm Name | By: | | |
|---|---|---|---|
| | Signature of Authorized Agent | | Date |
| Firm Name | By: | | |
| | Signature of Authorized Agent | | Date |

**NEW LIEN ASSIGNMENT:** The information below must be on an application for title and presented to the Secretary of State.

Secured Party: _____ Address: _____

Federal and State law requires that you state the mileage in connection with the transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

**ASSIGNMENT OF TITLE**

The undersigned hereby certifies that the vehicle described herein has been transferred to the following named person and address:

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:

☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage. WARNING-ODOMETER DISCREPANCY.

"If this vehicle is one of more than 5 commercial vehicles owned by me, I certify also that the vehicle is not damaged in excess of 33 1/3% of its fair-market value unless this document is accompanied by a salvage application."

ODOMETER READING | NO TENTHS

Signature(s) of Seller(s)

Printed Name(s) of Seller(s)

I am aware of the above odometer certification made by seller

Signature(s) of Buyer(s)

DATE OF SALE

Printed Name

I, Jesse White, Secretary of State of the State of Illinois, do hereby certify that according to the records of my Office, the person or entity named herein is the owner of the vehicle described hereon, which is subject to the above named liens and encumbrances, if any. IN WITNESS WHEREOF, I HAVE AFFIXED MY SIGNATURE AND THE GREAT SEAL OF THE STATE OF ILLINOIS, AT SPRINGFIELD.

CONTROL NO. H2303800

H2303800

*Jesse White*
JESSE WHITE, Secretary of State

DO NOT ACCEPT TITLE SHOWING ANY ERASURE, ALTERATION, CRIMINAL LAW

EXHIBIT
2

THOMAS GANZ        19P
WASHINGTON COUNTY CLERK RECORDER
VALIDATION:                    50.00
SLS Date 10/01/2010    Time 08:43:13
I 247582                        M 744/28

After Recording Return To:
Vanderbilt Mortgage & Finance, Inc.
Attn: Rebecca Howerton
500 Alcoa Trail
Maryville, TN 37804

Date: 10/1/2010

Rental Housing Support
Program Fund surcharge: $ 10.00

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated September 27, 2010, together with all Riders to this document.
(B) **"Borrower"** is  Debra L. Rice, a single person, and Sylvia R. Hayden, a single person,  . Borrower is the mortgagor under this Security Instrument.
(C) **"Lender"** is Vanderbilt Mortgage and Finance Inc.  Lender is a Tennessee corporation organized and existing under the laws of Tennessee.  Lender's address is 5000 Clayton Rd Maryville TN 37804.  Lender is the mortgagee under this Security Instrument.
(D) **"Note"** means the promissory note signed by Borrower and dated September 27, 2010.  The Note states that Borrower owes Lender fifty-four thousand seven hundred two 01/100 Dollars (U.S. $ 54702.01 ) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than October 1, 2020.
(E) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
(F) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(G) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | | | |
|---|---|---|---|---|
| ☐ Adjustable Rate Rider | ☐ | Condominium Rider | ☐ | Second Home Rider |
| ☐ Balloon Rider | ☐ | Planned Unit Development Rider | ☐ | Other(s) [specify] _____ |
| ☐ 1-4 Family Rider | ☐ | Biweekly Payment Rider | ☑ | Manufactured Home Rider |

(H) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3014   1/01   (page 1 of 16 pages)

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby

mortgage, grant and convey to Lender and Lender's successors and assigns the following described property located in the County of _____ Washington _____ : **See Attached Exhibit A**

[Name of Recording Jurisdiction]

which currently has the address of _____ **1151 State Route 153** _____
_____[Street]
_____ Coulterville _____ , Illinois ___ 82237 ___ ("Property Address"):
[City]                              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the

Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees,

and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the

I 247582                          H 744/33

policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

I 247582                                    M 744/34

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3014   1/01 *(page 8 of 16 pages)*

I  247582                                    M  744/35

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk,

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT         Form 3014   1/01   *(page 9 of 16 pages)*

I 247582                                                   M 744/35

or reducing losses.  If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.  **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss

in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

15

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.   Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

22.    Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23.    Release.  Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.  Borrower shall pay any recordation costs.  Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24.    Waiver of Homestead.  In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25.    Placement of Collateral Protection Insurance.  Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will

be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          *Debra L Rice*                         (Seal)
                                                              - Borrower

_____          *Sylvia R Hayden*                   (Seal)
                                                              - Borrower

_____ [Space Below This Line for Acknowledgment] _____

STATE OF ILLINOIS
COUNTY OF *Jefferson*

This instrument was acknowledged before me by *Debra L. Rice and Sylvia R Hayden*
*September* 27, 2010.

*Pamela Pinegar*                         *Pamela Pinegar*
Notary Public, State of Illinois           Notary Printed Name

*837 Meadowbrook*                       *Mt Vernon IL 62864*
Notary Address                              Notary City, State & Zip

*7-29-2011*
My Commission Expires (Date)

OFFICIAL SEAL
PAMELA PINEGAR
Notary Public, State of Illinois
My Commission Expires 07-29-2011

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014  1/01 *(page 16 of 16 pages)*

I 247582                                              M 744/43

# ATTORNEYS' TITLE GUARANTY FUND, INC.

## LEGAL DESCRIPTION

**Legal Description:**

That part of the Southeast Quarter of the Southeast Quarter of Section Twenty-six (26), Townhsip Three (3) South, Range Five (5) West of the Third Principal Meridian, Washington County, Illinois.  Described as follows:

Beginning at an iron pin set at the Southeast corner of a tract of land described in Warranty Deed to Michael E. Keck and Gwendolyn Keck as recroded in Book 543 Page 445 in the Washington County Recorder's Office, said point located on the East line of the Soutehast Quarter of the Southeast Quarter of said Section 26, a distance of 866.00 feet North of the Southeast corner of said Section; thence South 00 degrees 10 minutes 05 seconds Weston said East line 190.20 feet to an iron pin set; thence South 89 degrees 55 minutes 59 seconds West, 458.05 feet to an iron pin set; thence North 00 degrees 01 minutes 05 seconds East, 190.20 feet to an iron pin set on the South line of a tract of land described in Warranty Deed to Timothy D. Schnoeker and Robyn D. Schnoeker recorded in Book 310 Page 363 in the Washington County Recorder's Office; thence North 89 degrees 55 minutes 59 seconds East on the South line of said Schnoeker tract and the South line of said Keck tract, 458.05 feet to the point of beginning.

Containing 2.00 acres, more or less, and subject ot the Right-of-way of Illinois Route 153 and to all other easements and Rights-of-way of record.

**Permanent Index Number:**

Property ID: 09.15.26.400.018

**Property Address:**

1151 State Route 153
Coulterville, IL  62237

I 247582                    N 744/44